

**FILED**
U S DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 1 3 2020

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

David BRENNAN,

                    Plaintiff

        vs.                               Civil Action, Case No. 4:20-cv-505-KGB

UNITED STATES OF AMERICA,
Jovita CARRANZA in her
official capacity as Administrator
of the U.S. Small Business Administration,
and Steven MNUCHIN in his official capacity
as U.S. Secretary of the Treasury.

                    Defendants

## VERIFIED COMPLAINT
### AND
## EMERGENCY PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF
## ALTERNATIVELY FOR WRIT OF MANDAMUS

Comes now David Brennan, *pro se*, *in propria persona*, being competent to testify as to

the matters attested to herein, and for his Verified Complaint and Emergency Petition for

Declaratory and Injunctive Relief Alternatively for Writ of Mandamus, states, on oath or

affirmation, under penalty of perjury that the following is true to the best of his knowledge,

information, and belief:

### Parties

1.      Plaintiff is a natural person residing and doing business as a sole proprietor in

Searcy, Arkansas.  As a sole proprietor, he is primarily engaged in a political podcast and the sale

of political-themed T-shirts and novelty items.

2.      Defendants are the United States of America, Jovita Carranza in her official

capacity as Administrator of the U.S. Small Business Administration, and Steven Mnuchin in his

This case assigned to District Judge_Baker_
and to Magistrate Judge_Deere_

official capacity as U.S. Secretary of the Treasury. The Administrator is a party defendant

because she administers the Emergency EIDL Grant program established by Sec. 1110 of the

CARES Act. The United States and the Secretary are parties defendant because any injunctive

relief or mandamus granted will require disbursement of funds from the Treasury, whether from

direct appropriations for the Emergency EIDL Grant or from the General Fund.

### Jurisdiction and Venue

3.      This Complaint being brought for redress of a legal wrong suffered by way of

U.S. Agency action, this court has personal and subject matter jurisdiction under 5 U.S.C. § 702.

This court has federal question jurisdiction under 28 U.S.C. § 1331, federal defendant

jurisdiction under 28 U.S.C. § 1346, and mandamus jurisdiction under 28 U.S.C. § 1361.

4.      Venue in the Eastern District of Arkansas is appropriate under 28 U.S.C. § 1391(e)

(1)(C).

### Background

5.      This court well knows and Plaintiff need not recite the enduring economic distress

this nation, its people, and its businesses have experienced and continue to experience due to the

COVID-19 pandemic of 2020 and the response made by the governors of the several states

intended to mitigate the spread of the virus. The economic effects have certainly touched nearly

every person and business concern within our borders, some worse than others.

6.      On March 27, 2020, the President of the United States signed Public Law 116-

136, the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) into law. Within

the CARES Act, Congress recognized and sought to alleviate the emergency economic needs of

small business concerns affected directly or indirectly by the pandemic. Specific among this

relief, and separate and apart from the famed Paycheck Protection Program established in Sec.

1102 of the CARES Act, is the Emergency EIDL Grant established in Sec. 1110 **(Exhibit 1)** as a

general assistance program for small business concerns affected by the COVID-19 pandemic.

7.     Sec. 1110 establishes the Emergency EIDL Grant as an advance on an Economic

Injury Disaster Loan, administered by the U.S. Small Business Administration,  which need not

be repaid even if the applicant is subsequently denied the loan.  Under  Sec. 1110(e)(1), an

applicant is permitted to request an advance to be made within three days of application **in an**

**amount the applicant requests**, subject to the $10,000.00 limitation of Sec. 1110(e)(3):

> (e) Emergency Grant.--
> (1)     In General.-- During the covered period, an entity included for eligibility
> in subsection (b), including small business concerns, private nonprofit
> organizations, and small agricultural cooperatives, that applies for a loan under
> section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)) in response to
> COVID-19 may request that the Administrator provide an advance that is, subject
> to paragraph (3), **in the amount requested by such applicant** to such applicant
> within 3 days after the Administrator receives an application from such applicant.

(emphasis added)

8.     Sec. 1110 of the CARES Act is the legislative entirety of the Emergency EIDL

Grant program, and **no other grant authority** to the Small Business Administration whatsoever

appears anywhere in the Economic Injury Disaster Loan program proper (15 U.S.C. § 636 (b)).

9.     Sec. 1110 contains no limiting term as to the number of grants to be awarded by

the Administrator or the total outlay under the program, such as "subject to available funding" or

"to the extent of Congressional appropriation." The number of grants which the Administrator

may award and the total outlay therefore under the section appears to be statutorily limited only

by the length of the "covered period" set out therein.

10.     By way of Sec. 1110(e)(7), as amended, Congress has to date made a total of

$20,000,000,000.00 (twenty Billion dollars) in direct appropriations for the Emergency EIDL Grant program. Congress has communicated to the Administrator that it stands ready to increase the appropriation as needed. **(Exhibit 2)**

11.     Sec. 1114 of the Cares Act **(Exhibit 3)** affirmatively requires the Administrator to issue regulations for the administration of the small business assistance programs contained in the Act, including the Emergency EIDL Grant program, within 15 days of enactment.  Though an interim final rule was timely issued and published for the implementation of the Sec. 1102 Paycheck Protection Program (PPP), the Administrator **did not** issue and publish **any regulation or rule** for the implementation of the Sec. 1110 Emergency EIDL Grant program within 15 days of its enactment or incorporate by reference any such regulation or rule in any published regulation or rule within the statutory timeframe.  Though at the time of the passage of the CARES Act, there were existing regulations and procedural rules for the processing of applications and determining of eligibility for non-COVID-19 EIDL **loans**, Sec. 1110 establishes its own eligibility standards and indeed establishes the Emergency EIDL **Grant** as an entirely different critter with approval separate and independent of the EIDL loan. This status as a separate program is made clear by the direction of Congress that the Emergency advance/grant is to be disbursed upon self-certification by the applicant (Sec. 1110(e)(2)) and that the applicant shall not be required to repay the advance/grant even if turned down for the EIDL loan (Sec. 1110(e)(5)).

**Facts**

12.     It was the initial policy of the Administrator that SBA would advance to each and every Sec. 1110 EIDL applicant requesting an advance a full $10,000.00 advance/grant.  As

4

shown in **Fig. 1** below, on March 31, 2020, the SBA spokeswoman was communicating to the

media that SBA was "advancing $10,000 to all applicants."



**Figure 1 – The Philadelphia Inquirer, March 31, 2020**

This was confirmed by SBA Economic Development Specialist David Hincapie in an April 1,

2020 webinar entitled *Demystifying SBA's Economic Injury Disaster Loans.*

(https://youtu.be/9KjJCHcfpWg). Speaking for the SBA, beginning at approximately the 12:05

mark, Mr. Hincapie explains that the reason for the three-day advance/grant is that the

application process will take about 35 days.  At approximately the 12:47 mark, speaking of the

check box for the advance appearing in the streamlined EIDL application, Mr. Hincapie says,

"Check it, and you're gonna get the $10,000.00 advance."  Together, these representations to the

public put all potential applicants for the Emergency EIDL Grant under Sec. 1110 on notice that

it was SBA policy and procedure to award an automatic $10,000.00 advance/grant to every

applicant who completed the self-certification and checked the box indicating they were

requesting an advance.



Fig. 2 – Screenshot from David Hincapie webinar

13.     On or about March 30, 2020, a streamlined application was finalized and put into use on the SBA website. The streamlined application indeed included a check box to request the advance/grant, and there was **no indication** that the advance/grant amount would be determined by the number of employees employed by the applicant.

14.     On March 31, 2020, as a zero-employee sole proprietor and eligible entity under Sec. 1110(a)(2)(B) of the Act,[1] Plaintiff accessed the Small Business Administration website and completed the streamlined application for an EIDL and Emergency EIDL Grant while it was still the policy of the Administrator to advance the full $10,000.00 to every applicant. This included executing the self-certification required by Sec. 1110(e)(2) of the Act. He was given the application number 3300708398. Plaintiff checked the check box but did not receive the $10,000.00 advance within three days. In fact, it was 21 days before Plaintiff received any advance at all.

15.     Within the first few days of accepting Sec. 1110 EIDL applications via the streamlined application on the SBA website, it became clear that there would be more applicants than SBA could disburse the full $10,000.00 advance to given the initial CARES Act

---

1   Plaintiff's status as an eligible entity under the Act was ratified by SBA through its disbursal of a fractional EIDL grant in the amount of $1,000.00 to his bank account on April 21, 2020.

appropriation of $10,000,000,000 (ten Billion dollars).  Rather than sending up an emergency

flare to Congress in the form of an urgent request for additional appropriations for the grant

program as she did with PPP, the Administrator inexplicably chose instead to ration the EIDL

advance/grant, determining the amount to be disbursed to an applicant **not** according to the

"amount requested by such applicant" as contemplated in Sec. 1110(e) **but instead** according to

the number of employees on staff with the applicant.  To the best of Plaintiff's knowledge,

information, and belief, the Administrator, has quite inexplicably **still** not, as of the date of this

filing, requested additional funds for the Emergency EIDL Grant program from Congress.

16.     According to a table published by the Administrator on the SBA website (**Exhibit**

**4**), as of May 8, 2020, the Administrator had disbursed a total of 3,009,934 Emergency EIDL

Grants at a total outlay of $9,883,210,000.  According to the Declaration of Eric N. Wall, a

Senior Loan Officer with the SBA (**Exhibit 5**), as of April 29, 2020, the SBA had received

approximately 5.5 million EIDL applications under Sec. 1110 and was sending an average of

109,785 applications for disbursement daily.

17.     According to an official guidance memorandum dated April 7, 2020 authored by

Kimberly S. Butler, Director, office of Grants Management, (**Exhibit 6**) SBA began processing

EIDL applications and awarding the Sec. 1110(e) Emergency EIDL Grants on a per-employee

rationed basis on April 7, 2020, effectively turning Sec. 1110 into a sort of PPP-lite and applying

this unpublished rule in an *ex post facto* manner to Emergency EIDL Grant applications which

were received by the Administrator **prior to** the formulation and implementation of the rule.

18.     Plaintiff, an eligible entity under the CARES Act, was not awarded an Emergency

EIDL grant within the statutory three-day timeframe but instead received his grant 21 days after

7

his application – **seven times the statutorily mandated turnaround time** for the **emergency grant**. Plaintiff did not receive the $10,000.00 he had every legal and moral right to count on. Instead, pursuant to the Administrator's rule of rationing the grants as set out in Exhibit 6, applied *ex post facto* to his application, Plaintiff was disbursed from the Treasury a whopping $1,000.00. Plaintiff has, as of the date of this filing, yet to receive any communication whatsoever from SBA regarding an EIDL loan.

19.     Although the Administrator did issue a timely interim final rule for the implementation of the Paycheck Protection Program, she did not issue a similar rule or regulation for EIDL. This grant rationing policy therefore does not appear in any regulation or rule published in the Federal Register within 15 days of the enactment of the CARES Act, nor is it incorporated by reference in any such published regulation or rule.

20.     Plaintiff has done business with various private and commercial lease creditors in his town with a perfect payment record since 2009 and has established a solid business reputation and good will among the local lease creditors over this time. Plaintiff holds the technological equipment (computers, cameras, microphones, etc.) necessary to conduct his political podcast and design his T-shirts on a private lease for which he has been unable to pay the April Payment in full or pay any of the May payment due to the Administrator's egregious delay of 18 days in disbursing his Emergency EIDL Grant and her unpublished rule of rationing the grant amount by employee count. Without immediate disbursal of the remainder of his Emergency EIDL Grant, due to his default on this lease, repossession is imminent, and he will not be able to re-lease, let alone secure the upgrades to both his equipment and Internet service that are necessary to conduct his podcast during this time when vastly increased usage has

slowed his standard residential Internet connection, which had been sufficient prior. Plaintiff holds the furnishings and fixtures for his podcast studio on a commercial lease for which he is unable to make the June payment without disbursal of the remainder of his Emergency EIDL Grant. Repossession will occur without payment, and he will be unable to re-lease due his default. It is unclear how much longer, if at all, Plaintiff will be able to keep the wolves at bay with mere assurances that the money, of which SBA had given public assurances, is on its way.

21.     Without immediate disbursal of the remaining $9,000.00 of the $10,000.00 Emergency EIDL Grant for which SBA was, at the time of his application, offering public assurances, Plaintiff will suffer irreparable harm, including the permanent loss of his technological equipment, furnishings, and fixtures with the inability to re-lease due to the damage to and loss of his business reputation and good will with lease creditors and in the local lease creditor community which is critical to his being able to conduct his business, the permanent loss of his podcast and T-shirt business, and the inability to exercise his right to freedom of political speech through his podcast and T-shirt sales.

22.     Plaintiff had worked for over a year on a shoestring budget, starting with nothing but a dream and a prayer to get his operation off the ground. He developed and tested various iterations of his podcast filming with substandard equipment in a makeshift studio in the loft of his barn-style efficiency home. Through favorable deferred payment loans from family and a once-in-a-lifetime favorable lease on his equipment, Plaintiff was able to construct a state-of-the-art podcast studio in early 2020. Shortly thereafter, he hit on a format and style that resonated. Had he been able to upgrade his equipment and Internet connection to conduct his operations on this now very clogged Internet without losing subscribers, his business was projected to bring in

a net profit of $4,200.00 for the month of April, which isn't bad for a trailer park boy in Searcy, Arkansas. This was the epitome of the American dream – profit through hard work, perseverance, creativity, and luck – and it was starting to take off. It was put on hold by the COVID-19 pandemic, and it is being destroyed by the Administrator's egregious delays and her unpublished Rule rationing the amount of the Emergency EIDL Grant by employee count.

## I.
### Violation of 5 U.S.C. § 552(a)(1)

23.     Sec. 1114 of the CARES act affirmatively requires, through the use of the words "shall issue regulations," the Administrator to issue regulations for the implementation of the PPP and EIDL grant programs within 14 days of enactment. Though the Administrator issued and published a timely interim final rule on PPP, she did not do so for the EIDL grant program.

24.     The April 7 official guidance memo establishes a formal or informal procedure for the processing and approval of EIDL loan/grant applications submitted pursuant to the CARES Act subject to the publication requirement of 5 U.S.C. § 552(a)(1)(B) and is indeed a rule or set of rules of procedure required to be published under 5 U.S.C. § 552(a)(1)(C). Furthermore, it constitutes a rule of general applicability to all Sec. 1110  Emergency EIDL Grant applicants, currently numbering in excess of 3,000,000, and is therefore required to be published by 5 U.S.C. § 552 (a)(1)(D). Additionally, the rule can only exist as an aspect of the Administrator's interpretation of Sec. 1110, and as an interpretation of general applicability, it must be published as required by § 552 (a)(1)(D).

25.     5 U.S.C. § 552(a)(1) provides:

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so

published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

Because the Administrator's grant rationing rule was never published or incorporated by reference in any timely published rule or regulation, and because the rule had not even been implemented at the time of his application, the rule may not adversely affect Plaintiff, and he is entitled to the full $10,000.00 Emergency EIDL Grant the CARES Act requires and the SBA was publicly promising at the time he applied. No amount of discretion can allow the Administrator to adversely affect Plaintiff by way of a rule that didn't exist until **after** he applied.

26.    It goes without saying that the reduction of a grant that was advertised as a $10,000.00 grant to anything less than $10,000.00 based on employee count – especially to $1,000.00 is an adverse effect.

## II.
## Grant Rationing Rule Is Contrary to the CARES Act

27.    Sec. 1110 (a)(2)(B) of the CARES Act, specifically includes "any individual who operates under a sole proprietorship, **with or without employees,** or as an independent contractor" (emphasis added) as an entity eligible for the Emergency EIDL Grant.

28.    Sec. 1110(e) explicitly allows an applicant to obtain an advance/grant "in the amount requested by such applicant up to and including $10,000.00. This is the only language in the CARES Act pertaining to determination of the Emergency EIDL Grant amount. The Administrator's unpublished grant rationing rule robs this language of all meaning, significance, and effect and is inconsistent with the canons of statutory construction.

29.    Reading these two sections together, it is clear that Congress intended for an

independent contractor or sole proprietor, without regard to employee count, to be able to obtain

an Emergency EIDL Grant in any amount up to $10,000.00.  It is further clear that Congress

thought the applicant, rather than the Administrator, best suited to determine the grant amount.

The administrator may think this unwise, but it is Congress' call and not hers.  The

administrator's unpublished rule setting herself up as the determiner of the grant amount and

rationing the grant amount by employee count is clearly out of harmony with the Act.

   30. The notion that Congress intended to allow the Administrator discretion to ration

the grant amount by this employment-centered metric is completely undermined not just by the

language of Sec. 1110 but by the existence of two separate programs within the CARES act

aimed at employees: the Paycheck Protection Program (PPP) of Sec. 1102 et seq. and Pandemic

Unemployment Assistance (PUA) of Sec. 2102.  The idea that Congress intended to establish the

Emergency EIDL Grant as yet a third employee-centered program is fanciful at best and finds no

support in the language of Sec 1110.

   31. The Administrator does not have discretion to ration the grant amount by any

metric, let alone employee count, as to do so countermands the clear language of the Act and the

intent of Congress expressed thereby.

   32. This court should hold unlawful and set aside the grant rationing rule, enjoin the

Administrator from enforcing it, and order Defendants to take immediate corrective action to

remedy the Administrator's prior enforcement of the rule.

### III.
### Grant Rationing Rule Is Arbitrary and Irrational

   33. In addition to being unenforceable under the Administrative Procedure Act and

flatly at odds with the clear intent of Congress that sole proprietors be allowed to obtain an

Emergency EIDL Grant in the amount they request up to $10,000.00, the Administrator's grant rationing rule is arbitrary and irrational.

34.     There is no indication that the Administrator performed any calculation that determined employee count to be an effective rationing means, as opposed to operating expenses or level of economic injury, just to name a couple of possible rationing metrics, to ensure meaningful assistance to small businesses.  Further, there is no rational support for the idea that spreading the assistance out over a larger number of recipients accomplishes anything other than to so dilute the assistance as to make it meaningless to the smallest businesses.

35.     In her administration of the Emergency EIDL Grant program, the Administrator has established and applied a rule that lacks any rational relation to the Act and actually harms most the sole proprietor and independent contractor that Congress specifically sought to include. The rule is arbitrary and irrational.

### Appropriate Relief

36.     5 U.S.C. § 706(1) provides this court authority to "compel agency action unlawfully withheld or unreasonably delayed."  It has additional authority under 5 U.S.C. § 706(2) to "hold unlawful and set aside agency action, findings, and conclusions" that are: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ...(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law ..."

37.     The Administrator's unpublished rule was indeed required to be issued as a regulation by Sec. 1114 of the Cares Act within 15 days of the Act's passage and is required by 5 U.S.C. § 552(a)(1) to be published in the Federal Register.  The rule not having been published

and Plaintiff having not had actual and timely notice of the rule at the time of the application, he must be held harmless from its application, and the rule must be found unlawful and set aside for this reason alone under 5 U.S.C. § 706(2)(D).

38.     There is also no doubt that the Administrator's rule rationing the Emergency EIDL Grant by employee count is *ultra vires* or in excess of the authority conferred by the CARES Act, arbitrary, an abuse of discretion, and otherwise not in accordance with the Act. The grant rationing rule must, therefore, be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A) and (C).

39.     This court should, pursuant to 5 U.S.C. § 706(1), restrain the Administrator from enforcing her rule determining grant amounts according to employee count and compel her to implement Sec. 1110 according to its express terms without embellishment by way of untimely or unpublished rule or regulation. The rule being held unlawful and set aside, Defendants should be compelled to make disbursements for all Emergency EIDL Grant applicants in accordance with the Act and the timeframe mandated therein and make whole all applicants who have had their grants rationed under the rule, including Plaintiff. (Though plaintiff does not purport herein to seek any class certification or to represent anyone's interests other than his own, it is inescapable that any order granting him specific relief could not be justly confined to his person but would be required by justice to operate broadly to compel Defendants to merely comply with the language of the CARES Act with respect to all applicants.)

40.     Further, 5 U.S.C. § 705, in pertinent part, states:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

14

Plaintiff has, contemporaneously herewith, submitted his Emergency Motion for *Ex Parte* Temporary Restraining Order and Preliminary and Permanent Injunction. In light of the emergency circumstances set out in this Verified Complaint these are appropriate remedies under the CARES Act and 5 U.S.C. § 705.

### Alternative Relief

41.    To the extent that any relief requested herein by Plaintiff sounds in Mandamus, the court is refereed to Plaintiff's averments of irreparable harm herein. Additionally, it is clear from reading Cares Act Sec. 1110 (a)(2)(B) and Sec. 1110(e) together that the Act devolves upon the Administrator and the Secretary a purely ministerial duty to award and disburse Emergency EIDL Grants to **all applicants in the amount they request** based upon their self-certification. The existence of this ministerial duty is so clearly established as to be beyond all doubt to the rational and impartial mind. Because this action does not sound in tort, the SBA has not waived its damages immunity, and there is no private right of action in the CARES Act, there is no other adequate remedy at law.

**Wherefore;**

Plaintiff respectfully requests this court grant him: **1)** declaratory relief in the form of an order holding unlawful and setting aside the Administrator's unpublished rule rationing the amount of Emergency EIDL Grants awarded under Sec. 1110 of the CARES Act; **2)** an *ex parte* temporary restraining order restraining the Administrator from enforcing her unpublished EIDL Grant rationing rule and preserving the status quo and the remaining appropriation by restraining the Administrator from awarding and the Secretary from disbursing any additional EIDL Grants; **3)** a Preliminary and Permanent Injunction restraining the Administrator from enforcing the

EIDL Grant rationing rule, compelling the Administrator to implement Sec. 1110 of the CARES

act as written for all applicants without rationing, including immediately awarding Plaintiff the

remaining $9,000.00 of his Emergency EIDL Grant, and compelling the Secretary to

immediately disburse to Plaintiff the remaining $9,000.00 of his Emergency EIDL Grant upon

such award, and **4)** expedited proceedings as appropriate under Fed R. Civ. P. 65, together with

such other and further relief, including any modification of the relief requested herein, that the

court may, upon motion or *sua sponte*, find just and proper.

Respectfully submitted,

David Brennan
1200 Curd Drive, lot 8
Searcy, AR 72143
501-388-5106
MagicGritsLegal@gmail.com

**Verification**

State of Arkansas    )
                    )ss.
County of White    )

On this day appeared personally before me, the undersigned, a Notary Public within and
for said County and State, duly commissioned, qualified and acting, David Brennan, to me well
known or satisfactorily proven, and, on oath or affirmation and under penalty of perjury,
executed the foregoing in my presence.

WITNESS my hand and seal this 13th day of May 2020.



Notary Public

My commission expires:

06/09/2023

16


PLAINTIFF'S
EXHIBIT
1

66

1 tinuing participation as a lender under section 7(a) of the

2 Small Business Act (15 U.S.C. 636(a)).

3  (h) PROGRAM ADMINISTRATION.—With guidance

4 from the Secretary, the Administrator shall administer the

5 program established under this section, including the mak-

6 ing and purchasing of guarantees on loans under the pro-

7 gram, until the date on which the national emergency de-

8 clared by the President under the National Emergencies

9 Act (50 U.S.C. 1601 et seq.) with respect to the

10 Coronavirus Disease 2019 (COVID–19) expires.

11  (i) CRIMINAL PENALTIES.—A loan under this section

12 shall be deemed to be a loan under the Small Business

13 Act (15 U.S.C. 631 et seq.) for purposes of section 16

14 of such Act (15 U.S.C. 645).

15 **SEC. 1110. EMERGENCY EIDL GRANTS.**

16  (a) DEFINITIONS.—In this section—

17   (1) the term ''covered period'' means the period

18   beginning on January 31, 2020 and ending on De-

19   cember 31, 2020; and

20   (2) the term ''eligible entity'' means—

21    (A) a business with not more than 500 em-

22    ployees;

23    (B) any individual who operates under a

24    sole proprietorship, with or without employees,

25    or as an independent contractor;

Case 4:20-cv-00505-KGB   Document 1   Filed 05/13/20   Page 18 of 33
O:\HEN\HEN20312.xml [file 1 of 2]                                S.L.C.

67

1    (C) a cooperative with not more than 500

2   employees;

3    (D) an ESOP (as defined in section 3 of

4   the Small Business Act (15 U.S.C. 632)) with

5   not more than 500 employees; or

6    (E) a tribal small business concern, as de-

7   scribed in section 31(b)(2)(C) of the Small

8   Business Act (15 U.S.C. 657a(b)(2)(C)), with

9   not more than 500 employees.

10  (b) ELIGIBLE ENTITIES.—During the covered period,

11 in addition to small business concerns, private nonprofit

12 organizations, and small agricultural cooperatives, an eli-

13 gible entity shall be eligible for a loan made under section

14 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)).

15  (c) TERMS; CREDIT ELSEWHERE.—With respect to

16 a loan made under section 7(b)(2) of the Small Business

17 Act (15 U.S.C. 636(b)(2)) in response to COVID–19 dur-

18 ing the covered period, the Administrator shall waive—

19   (1) any rules related the personal guarantee on

20   advances and loans of not more than $200,000 dur-

21   ing the covered period for all applicants;

22   (2) the requirement that an applicant needs to

23   be in business for the 1-year period before the dis-

24   aster, except that no waiver may be made for a busi-

Case 4:20-cv-00505-KGB   Document 1   Filed 05/13/20   Page 19 of 33
O:\HEN\HEN20312.xml [file 1 of 2]                                    S.L.C.

68

1 ness that was not in operation on January 31, 2020;

2 and

3  (3) the requirement in the flush matter fol-

4 lowing subparagraph (E) of section 7(b)(2) of the

5 Small Business Act (15 U.S.C. 636(b)(2)), as so re-

6 designated by subsection (f) of this section, that an

7 applicant be unable to obtain credit elsewhere.

8 (d) APPROVAL AND ABILITY TO REPAY FOR SMALL

9 DOLLAR LOANS.—With respect to a loan made under sec-

10 tion 7(b)(2) of the Small Business Act (15 U.S.C.

11 636(b)(2)) in response to COVID–19 during the covered

12 period, the Administrator may—

13  (1) approve an applicant based solely on the

14 credit score of the applicant and shall not require an

15 applicant to submit a tax return or a tax return

16 transcript for such approval; or

17  (2) use alternative appropriate methods to de-

18 termine an applicant's ability to repay.

19 (e) EMERGENCY GRANT.—

20  (1) IN GENERAL.—During the covered period,

21 an entity included for eligibility in subsection (b), in-

22 cluding small business concerns, private nonprofit

23 organizations, and small agricultural cooperatives,

24 that applies for a loan under section 7(b)(2) of the

25 Small Business Act (15 U.S.C. 636(b)(2)) in re-

69

1      sponse to COVID–19 may request that the Adminis-

2      trator provide an advance that is, subject to para-

3      graph (3), in the amount requested by such appli-

4      cant to such applicant within 3 days after the Ad-

5      ministrator receives an application from such appli-

6      cant.

7      (2) VERIFICATION.—Before disbursing amounts

8      under this subsection, the Administrator shall verify

9      that the applicant is an eligible entity by accepting

10      a self-certification from the applicant under penalty

11      of perjury pursuant to section 1746 of title 28

12      United States Code.

13      (3) AMOUNT.—The amount of an advance pro-

14      vided under this subsection shall be not more than

15      $10,000.

16      (4) USE OF FUNDS.—An advance provided

17      under this subsection may be used to address any al-

18      lowable purpose for a loan made under section

19      7(b)(2) of the Small Business Act (15 U.S.C.

20      636(b)(2)), including—

21      (A) providing paid sick leave to employees

22      unable to work due to the direct effect of the

23      COVID–19;

Case 4:20-cv-00505-KGB   Document 1   Filed 05/13/20   Page 21 of 33
O:\HEN\HEN20312.xml [file 1 of 2]                                    S.L.C.

70

    (B) maintaining payroll to retain employ-
ees during business disruptions or substantial
slowdowns;

    (C) meeting increased costs to obtain ma-
terials unavailable from the applicant's original
source due to interrupted supply chains;

    (D) making rent or mortgage payments;
and

    (E) repaying obligations that cannot be
met due to revenue losses.

    (5) REPAYMENT.—An applicant shall not be re-
quired to repay any amounts of an advance provided
under this subsection, even if subsequently denied a
loan under section 7(b)(2) of the Small Business Act
(15 U.S.C. 636(b)(2)).

    (6) UNEMPLOYMENT GRANT.—If an applicant
that receives an advance under this subsection trans-
fers into, or is approved for, the loan program under
section 7(a) of the Small Business Act (15 U.S.C.
636(a)), the advance amount shall be reduced from
the loan forgiveness amount for a loan for payroll
costs made under such section 7(a).

    (7) AUTHORIZATION OF APPROPRIATIONS.—
There is authorized to be appropriated to the Ad-

Case 4:20-cv-00505-KGB   Document 1   Filed 05/13/20   Page 22 of 33
O:\HEN\HEN20312.xml [file 1 of 2]                                        S.L.C.

71

1 ministration $10,000,000,000 to carry out this sub-

2 section.

3   (8) TERMINATION.—The authority to carry out

4 grants under this subsection shall terminate on De-

5 cember 31, 2020.

6   (f) EMERGENCIES INVOLVING FEDERAL PRIMARY

7 RESPONSIBILITY QUALIFYING FOR SBA ASSISTANCE.—

8 Section 7(b)(2) of the Small Business Act (15 U.S.C.

9 636(b)(2)) is amended—

10   (1) in subparagraph (A), by striking "or" at

11 the end;

12   (2) in subparagraph (B), by striking "or" at

13 the end;

14   (3) in subparagraph (C), by striking "or" at

15 the end;

16   (4) by redesignating subparagraph (D) as sub-

17 paragraph (E);

18   (5) by inserting after subparagraph (C) the fol-

19 lowing:

20    "(D) an emergency involving Federal pri-

21  mary responsibility determined to exist by the

22  President under the section 501(b) of the Rob-

23  ert T. Stafford Disaster Relief and Emergency

24  Assistance Act (42 U.S.C. 5191(b)); or"; and

25   (6) in subparagraph (E), as so redesignated—

Case 4:20-cv-00505-KGB   Document 1   Filed 05/13/20   Page 23 of 33
O:\HEN\HEN20312.xml [file 1 of 2]                                    S.L.C.

72

          (A) by striking "or (C)" and inserting "(C), or (D)";

          (B) by striking "disaster declaration" each place it appears and inserting "disaster or emergency declaration";

          (C) by striking "disaster has occurred" and inserting "disaster or emergency has occurred";

          (D) by striking "such disaster" and inserting "such disaster or emergency"; and

          (E) by striking "disaster stricken" and inserting "disaster- or emergency-stricken"; and

     (7) in the flush matter following subparagraph (E), as so redesignated, by striking the period at the end and inserting the following: ": *Provided further*, That for purposes of subparagraph (D), the Administrator shall deem that such an emergency affects each State or subdivision thereof (including counties), and that each State or subdivision has sufficient economic damage to small business concerns to qualify for assistance under this paragraph and the Administrator shall accept applications for such assistance immediately.".



PLAINTIFF'S
EXHIBIT
2
tabbies

# Congress of the United States
## Washington, DC 20515

April 25, 2020

| | |
|---|---|
| The Honorable Steven Mnuchin | The Honorable Jovita Carranza |
| Secretary of the Treasury | Administrator |
| U.S. Department of the Treasury | U.S. Small Business Administration |
| 1500 Pennsylvania Avenue NW | 409 3rd Street SW |
| Washington, D.C. 20220 | Washington, D.C. 20416 |

Dear Secretary Mnuchin and Administrator Carranza:

We write regarding implementation of the *Paycheck Protection Program and Health Care Enhancement Act (the "interim" COVID-19 act)* that was signed into law yesterday and builds on the small business rescue programs enacted as part of the *Coronavirus Aid, Relief, and Economic Security (CARES) Act (Public Law 116-136)*. This act replenishes funding for key SBA COVID-19 response programs, including $310 billion for the Paycheck Protection Program (PPP), $50 billion to leverage more than $350 billion for SBA's Economic Injury Disaster Loan (EIDL) program, and $10 billion for SBA's Emergency EIDL Grant program. This act also includes important policy reforms to expand access to SBA assistance to more unbanked and underserved businesses, including minority-owned businesses, rural businesses, small mom-and-pop shops, and smaller nonprofits that too often have been pushed to the back of the line.

As you implement this new legislation, we urge you to consider the following:

## Expand Access for Underserved and Main Street Businesses

We must ensure that federal recovery funding reaches businesses that have been underserved by mainstream lending institutions in the past. In the interim COVID-19 act, Congress set aside $60 billion in PPP lending, including $30 billion for small banks and credit unions with fewer than $10 billion in assets and for community-based lenders that include Minority Depository Institutions (MDIs), Community Development Financial Institutions (CDFIs), as well as SBA microlenders and Certified Development Companies (CDCs). To ensure CDFIs and MDIs are able to access this set-aside, SBA and Treasury should use their administrative authority to create a special set-aside of at least $10 billion of PPP funds solely dedicated for MDIs and CDFIs. These institutions' specific mission to serve low-income, rural, and minority small business owners and communities uniquely positions them to increase the amount of PPP loans that reach our underserved businesses. These businesses are the heartbeat of the diverse communities they serve and are particularly vulnerable during this crisis.

The SBA and Treasury must also use their administrative authority to proactively engage with MDIs and CDFIs, including Native and minority-led CDFIs, SBA microlenders and CDCs that wish to participate as PPP lenders. As part of this effort, SBA and Treasury must remove barriers to participation for these critical lenders, particularly for non-bank CDFIs. To swiftly achieve this goal, we request the following immediate actions be completed in the next 48 hours by SBA and Treasury:

- Set aside at least $10 billion for MDIs and CDFIs to make PPP loans;
- Eliminate the lender eligibility requirement for non-depository CDFIs to have "originated, maintained, and serviced more than $50 million in business loans or other commercial financial receivables during a consecutive 12 month period in the past 36 months;"[1]
- Ensure that non-depository CDFIs do not have to re-verify information of existing customers, if they have an ongoing financial relationship with the customer that is well documented;
- Include all Bank Security Act-related questions in the initial application so that lenders do not have to collect this information via a follow-up request;
- Ensure the swift and smooth integration of CDFIs, MDIs, and other small non-bank lenders into the SBA's E-TRAN system;
- Create, in coordination with the CDFI Fund and Treasury's Office of Minority and Women Inclusion, webinars tailored to MDIs and CDFIs wishing to become PPP lenders; and
- Collaborate with the Minority Business Development Agency (MBDA), the Economic Development Administration (EDA), and the U.S. Department of Agriculture (USDA) in order to engage with minority, low- and moderate-income, and rural communities and ensure that small business owners and nonprofits in those communities have equal access to PPP information and funding.

To further expand access to this critical assistance, we also request that SBA and Treasury release new guidance to all lenders within the next 48 hours removing barriers for PPP loan applicants who are ex-offenders, including those who were charged but never convicted. Lenders should also be required to report on any applications rejected on this basis.

## Award $10,000 SBA Emergency EIDL Grants as Intended

Under the *CARES Act*, Emergency EIDL Grants were to be made in amounts of up to $10,000 within three days of receiving an application. However, SBA has taken much longer to disburse funds to businesses. Furthermore, the Trump Administration used its discretionary authority to severely limit these awards, permitting businesses to claim just $1,000 per employee. This means that, currently, a sole proprietor or a small family-run business with only two or three employees cannot receive the full $10,000 allowed under the statute. When SBA chose to place arbitrary limitations on award amounts and ration available funding rather than request a new appropriation (as it was willing to do for PPP), it failed small businesses and small private, nonprofits that had counted on these funds.

With the new $10 billion in funding for Emergency EIDL Grants that the interim COVID-19 act provides, the Administration should remove the limitations it imposed that prevents businesses from receiving a full $10,000 grant. Businesses that have previously received reduced grants because they have fewer than ten employees should receive the full amount, and, going forward, new recipients should receive full awards as well, regardless of their size. Furthermore, to prevent the Administration from once again refusing to request additional appropriations when the program is fully subscribed, SBA should notify Congress as soon as funds begin to run low rather than cut the amount small businesses receive. In addition, it should dedicate the resources it has received for administrative expenses to ensure that loans go out within the statutorily mandated three-day time frame.

---

[1] SBA, "Business Loan Program Temporary Changes; Paycheck Protection Program," *Federal Register* Vol. 85, No. 73 (Apr. 15, 2020), 20815, https://www.sba.gov/sites/default/files/2020-04/PPP%20Interim%20Final%20Rule_0.pdf.

With the goal of expanding access to this assistance, SBA should also conduct dedicated outreach and technical assistance to ensure all small businesses are aware of and able to access EIDL loans and grants. This includes concerted efforts to serve the truly small, unbanked, and underserved businesses, including minority-, woman-owned, and rural businesses.

## Update Eligibility for SBA's EIDL Loans and Grants to Include Farmers and Other Agricultural Enterprises

There has been a wide demand from the agricultural community for SBA to change its rules so farms and other agricultural enterprises can be eligible for the SBA's EIDL program and the new Emergency EIDL Grant program. Unfortunately, SBA has not provided such a rule change.

The interim COVID-19 act includes this key fix to support the nation's farmers. Now, farms and agricultural enterprises under 500 employees have been made eligible recipients for the EIDLs and Emergency EIDL Grants. Given that so many of our small producers and agricultural small businesses need urgent assistance, SBA must immediately update its guidance and application form to clarify this new eligibility.

## Implement Rigorous and Regular Reporting for Transparency and Oversight

Neither the public nor policymakers are getting information in a timely or complete manner, and the Administration's process for requesting funds and making changes is backwards. The first time Congress received a full data report on PPP was April 14, almost a week after the Administration announced PPP was running out of funding and requested an additional $250 billion. Treasury and the Office of Management and Budget (OMB) do not seem to be coordinating with SBA, as the Administration's request did not include funding for the EIDL and Emergency EIDL Grant programs, which had hit their caps the previous week and had higher demand than PPP.

SBA is accustomed to tracking spending and breaking out weekly data on their largest loan programs by number of loans, dollar amounts, demographics, loan sizes, information on new participating PPP lenders, and other information that they make publicly available. It is imperative that SBA use that expertise to provide robust and regular reporting on the COVID-19 SBA assistance through PPP, EIDL loans and grants, as well as SBA's other programs. This reporting is essential to making sure these programs are reaching all small businesses we intend to assist. Congress provided SBA with $675 million in the *CARES Act* and $2.1 billion in the interim COVID-19 act to hire additional staff and upgrade its technology for capacity and privacy protection. The Administration should already be using these funds to support staff to implement these programs and upgrade the capacity of SBA's systems to handle the unprecedented volume and make the grant and loan information public.

This funding should also be used to implement lender guidance on PPP loans to underserved and Main Street borrowers along with the registration of PPP loans. The *CARES Act* explicitly includes incentives for lenders to make small-dollar loans that benefit underserved borrowers, and includes a Sense of the Senate that Administrator Carranza should issue guidance to lenders on prioritizing the processing and disbursement of PPP loans to underserved borrowers. The *CARES Act* was signed into law on March 27th and still this has not happened. The delay has left many underserved and Main Street borrowers with the impression that the first-come, first-served process caused them to miss out on the first $350 billion in paycheck assistance. They fear the same will happen again when the

program reopens following this recent bill, especially since the Administration has said this is the last funding that will be provided for PPP. We urge the Administrator to issue this lender guidance before PPP is reopened with the additional funding, and to collect data on demographics along with job retention from borrowers when they apply and submit their documentation for forgiveness, similar to how it collects that data on other SBA loans.

The *CARES Act* also requires the Administrator to register PPP loans within 15 days using a TIN number to help to prevent borrowers from getting more than one loan. This is important to mitigate fraud in real time, as well as helpful information in future oversight audits. We expect SBA to treat PPP loans as it treats loans in its 7(a) and 504 programs by publicly publishing the company names and addresses of borrowers and lenders, along with the loan amounts.

We appreciate your immediate attention to these critical issues and thank you for your continued work to mitigate the impact that this public health crisis is having on our economy.

Sincerely,

Nancy Pelosi
Speaker
U.S. House of Representatives

Charles E. Schumer
Democratic Leader
U.S. Senate

Nydia M. Velázquez
Chairwoman
House Committee on Small Business

Benjamin L. Cardin
Ranking Member
Senate Committee on Small Business and Entrepreneurship

Maxine Waters
Chairwoman
House Committee on Financial Services

Sherrod Brown
Ranking Member
Senate Committee on Banking, Housing and Urban Affairs

**PLAINTIFF'S
EXHIBIT**

tabbies

83

1      made under Federal law relating to the na-

2      tional emergency declared by the President

3      under the National Emergencies Act (50

4      U.S.C. 1601 et seq.) with respect to the

5      coronavirus disease 2019 (COVID–19),".

6          (iii) MODIFICATION OF PLAN AFTER

7      CONFIRMATION.—Section 1329 of title 11,

8      United States Code, is amended by strik-

9      ing subsection (d).

10         (B) EFFECTIVE DATE.—The amendments

11     made by subparagraph (A) shall take effect on

12     the date that is 1 year after the date of enact-

13     ment of this Act.

**14  SEC. 1114. EMERGENCY RULEMAKING AUTHORITY.**

15     Not later than 15 days after the date of enactment

16  of this Act, the Administrator shall issue regulations to

17  carry out this title and the amendments made by this title

18  without regard to the notice requirements under section

19  553(b) of title 5, United States Code.

# SBA Disaster Assistance Update
## EIDL Advance / COVID-19

May 8, 2020



PLAINTIFF'S EXHIBIT
4

| Advances Disbursed | 3,009,934 | Total Dollars | $ 9,883,210,000 |
|---|---|---|---|

| STATE | APPROVED | DOLLARS | STATE | APPROVED | DOLLARS |
|---|---|---|---|---|---|
| Alabama | 37,132 | $ 120,793,000 | Kansas | 21,479 | $ 69,839,000 |
| Alaska | 7,261 | $ 24,558,000 | Kentucky | 25,054 | $ 82,340,000 |
| Arkansas | 20,099 | $ 65,251,000 | Louisiana | 52,733 | $ 167,319,000 |
| Arizona | 52,593 | $ 176,408,000 | Maine | 12,964 | $ 42,188,000 |
| California | 450,449 | $ 1,448,196,000 | Maryland | 47,846 | $ 168,535,000 |
| Colorado | 60,405 | $ 192,407,000 | Massachusetts | 64,819 | $ 222,480,000 |
| Connecticut | 33,793 | $ 109,950,000 | Michigan | 71,442 | $ 257,197,000 |
| Delaware | 7,776 | $ 27,050,000 | Minnesota | 44,956 | $ 153,061,000 |
| Florida | 297,763 | $ 897,753,000 | Mississippi | 24,450 | $ 77,282,000 |
| Georgia | 116,203 | $ 364,785,000 | Missouri | 42,785 | $ 140,755,000 |
| Hawaii | 19,566 | $ 61,509,000 | Montana | 13,018 | $ 40,025,000 |
| Idaho | 14,255 | $ 46,170,000 | Nebraska | 17,198 | $ 53,749,000 |
| Illinois | 101,679 | $ 340,966,000 | Nevada | 29,487 | $ 92,283,000 |
| Indiana | 36,938 | $ 131,643,000 | New Hampshire | 13,318 | $ 46,685,000 |
| Iowa | 16,497 | $ 54,761,000 | New Jersey | 98,379 | $ 326,486,000 |

*Figures as of 5/7/2020*

## DECLARATION OF ERIC N. WALL



I, Eric N. Wall, do hereby declare and state as follows:

1. I am a Senior Loan Officer for the U.S. Small Business Administration's ("SBA" or "the Agency") Office of Disaster Assistance ("ODA"). I have held this position since July 21, 2014.

2. In my position as a Senior Loan Officer, I serve as the Contracting Officer's Representative ("COR") for contract number 73351020F0071, which is being performed by RER Solutions, Inc. ("RER"). As the COR, I am responsible for managing RER's performance under its contract with SBA.

3. Under its contract, RER provides data analysis and loan recommendation services for SBA's disaster loan response to the COVID-19 pandemic. In performing these services, RER operates a computer system ("System") which processes applications under SBA's Economic Injury Disaster Loan ("EIDL") program.

4. Applicants submit applications for EIDLs and advance grants under the EIDL program on an SBA website, at covid19relief.sba.gov. This application includes a box to check if the applicant seeks to request an advance grant.

5. The information is submitted by applicants under penalty of perjury, then enters the System. The System houses incoming applications and processes those applications generally on a first-in, first-out basis through an analysis prescribed by SBA. This analysis includes, but is not limited to, removal of duplicate applications and identification of applications that bear certain indications of fraud. A sample copy of the online application screens is attached here as Exhibit A.

6. This analysis ensures that applications are complete and submitted from eligible and existing small businesses. For example, without doing so, SBA would be in the position of approving payment of advance grants multiple times to entities that submitted multiple applications, or paying to applications submitted in the names of deceased individuals.

7. Upon the enactment of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, SBA and RER prepared the System to process EIDL applications and advance grant requests, and the System began processing applications on April 7, 2020 in small batches, ramping up to full capacity April 16, 2020. At that time, approximately 3.79 million applications had already been submitted online and were in the System awaiting processing.

8. To date, the System has received approximately 5.4 million total applications, and SBA anticipates receiving more applications in the future. To date, the System has processed approvals for approximately 1.6 million advance grant requests.

9. The System can process up to one or two applications per second. However, even at this rapid pace, because there are only 86,400 seconds in a day, the System can only process a certain number of applications in a day.

10. Every day, seven days a week, the computer system sends lists of approved advance grant applications to SBA's Office of Chief Financial Officer ("CFO") for directing disbursement of those advance grants. Since the System began processing at full capacity, April 16, 2020, it has processed and sent an average of 109,785 applications per day to the CFO's office, with the exception of a brief interruption for approximately two days for technical reasons.

11. Because of the extraordinary volume of applications submitted prior to and since the date that the System began processing EIDL applications and advance grant requests, the System will take several more weeks to process the backlog of applications, despite its high speed in processing applications.

12. I have reviewed the System's record of information submitted by Lit Ventures LLC in its application for an EIDL and advance grant. The System shows that, in the field asking for "Number of Employees (As of January 31, 2020)," the number 12 was entered on Lit Ventures LLC's application.

I declare under penalty of perjury that, to the best of my knowledge and belief, the above statement is true and correct.

Executed this 29th day of April 2020.

*Eric Wall*
_____
Eric N. Wall
Senior Loan Officer
U.S. Small Business Administration
Office of Disaster Assistance



U.S. SMALL BUSINESS ADMINISTRATION
WASHINGTON, D.C. 20416



PLAINTIFF'S EXHIBIT

**Date:** April 7, 2020

**To:** Tami Perriello, Chief Financial Officer

**From:** Kimberly S. Butler, Director, Office of Grants Management

**Subject:** Authorization for Payments from RER Solutions

**Ref:** (a) OGC memo of 3 April 2020

In accordance with reference (a), this guidance initiates the authorization for payments from RER Solutions to the Office of the Chief Financial Officer for disbursement to the Bureau of Fiscal Service, U.S. Treasury.

On March 27th, 2020, President Trump signed Pub. L. No. 116-136, the Coronavirus Aid, Relief, and Economic Security (CARES) Act that includes authority under § 1110 for Emergency Economic Injury Disaster Loan (EIDL) Advances up to $10,000.

VERIFICATION.—Before disbursing amounts under this subsection, the Administrator shall verify that the applicant is an eligible entity by accepting a self-certification from the applicant under penalty of perjury pursuant to section 1746 of title 28 United States Code.

AMOUNT.—The amount of an Advance provided under this subsection shall be not more than $10,000.

## Verification
The Small Business Administration has contracted with RER Solutions for identity verification, data validation, and fraud detection.
1. EIDL applications collected through the Rapid Intake COVID-19 EIDL web form will be forwarded for processing to Rapid Decision automated processing platform configured and programmed in accordance with SBA Office of the Chief Financial Officer requirements as follows:
2. **Remove duplicates**
3. **Remove applicants previously funded under COVID-19 EIDL in the Disaster Credit Management System (DCMS)**
4. Perform fraud checks
5. Calculate eligible Advance amount based on logic provided by SBA
6. Applications that are not duplicates and not excluded based on fraud rules will be periodically placed in a batch file including fields required for processing through the Office of the Chief Financial Officer
7. Each batch file shall include batch number/code in the file name
8. Each batch file is sent to the Office of the Chief Financial Officer for funds check and creation of a Payment Automation Manager (PAM)-compliant file.

## Fraud Check Indicators
If any 1 of the BOLDED fraud indicators in the verification process are triggered or any 3 BOLDED OR NON-BOLD indicators are triggered, the application will not be included in a batch file.

1. **Large number of applications with other lenders** (large scale)

2. Large number of applications for this program (several in succession)
3. **Owner information failed validation** (information does not match, person is listed as deceased, etc.)
4. Client location is international
5. **Digital identity fraud suspicion/suspicious online behavior** – the data has been used fraudulently online
6. VOIP phone number
7. Phone number is not associated with business or owner
8. Email has not passed validation
9. **Invalid bank account number and/or routing number**
10. **Bank account ownership does not match business**
11. Unable to confirm business registration

Any approved disbursements where the bank account number and routing number are valid and indicate that the account can receive a deposit but the EIN/SSN can't be authenticated are authorized. A report for awards at the $10,000 value shall be provided to the Office of Grants Management within 60 days after the EIDL Advance program has completed its last disbursement.

## Payment Amount

The total disbursement amount for each record included in the payment file is calculated based on the following logic:

If number of employees is 0 then amount is $1,000

Otherwise if number of employees is greater than 10 then amount is $10,000

Otherwise amount is number of employees times $1,000

The total disbursement amount for each Advance file is the sum of the individual disbursements amount for each record in the file

Based on the procedures outlined above, and in accordance with § 1110 of Pub. L. No. 116-136 – (the CARES Act) and the streamlined procedures noted under 2 C.F.R. § 200.200(b), I authorize the disbursement of all records verified, validated, approved and  from RER Solutions to the Office of the Chief Financial Officer.

X _Kimberly S. Butler_

Kimberly S. Butler, Director,
Office of Grants Management